Good morning, Council. This is the case of Laborers Local No. 231 Pension Fund against Rory J. Cowan, et al., No. 20-1844. Mr. Barron. Yes, Your Honor. Randall Barron, representing Laborers Local No. 231 Pension Fund. May it please the Court, I'd like to reserve five minutes for rebuttal, if I may. Granted. And, yes, this is not a case about labor issues. It is, in fact, a securities case. We are here because the district court below ignored evidence that just demonstrates that there were material facts that were misstated in the proxy or omissions of material facts that made the statement in the merger proxy false or misleading in violation of Section 14a of the Securities and Exchange Act. Thematically, there are four separate false or misleading statements that we are proceeding on at this point, and they all relate to the same underlying problem, is that the defendants misrepresented or omitted facts which demonstrate that the forecasts that were provided to shareholders and the forecast that were used by the investment bankers were manipulated downward to justify an otherwise unfair price. Those statements are fundamentally these four. The first is related to the fact that there is evidence that those forecasts were part of doing a forward haircut. The statement falsely states that management updated the forecasts to based on updated 2016 fiscal forecast. In other words, the proxy statement says that the forecasts that were used in the fairness opinion or for the fairness opinion were updated based on operational issues when the evidence shows exactly contrary, that there was a set of projections that was prepared as a bottom-up manner for the preparation of the forecast. After they already considered all of the operational factors, they then took a 10% haircut. The documents that were presented in the record at PA-0249 and PA-0251 make very clear that there was what was called a contingency, which was just an across-the-board haircut, and in that indeed the CFO admitted as such in deposition when Mark Litz said, we just sort of took a haircut off the top of the plan to create the fairness projection. So again, there is no question that that information was not in the proxy. Shareholders weren't told that there was a 10% haircut. They were told exactly the opposite. There was some adjustment. Excuse me, counselor, am I correct that Litz said that the last quarter results can still inform future projections because that is what the results showed about customer trends and contracts? It is true that he said that, but again the issue is if you look at the SBU projections from which defendants admit that those were the foundation for the fairness projections, those were updated all the way up through that time in November and December. So all of those factors according to all of the evidence that's in the record was already there, and we can sort of go, I'm happy to spend the time to go through that evidence, but as we set forth there is evidence to show that all of those factors were in fact considered in this 10% haircut came on top. And again we're at summary judgment, so that at best is an issue of fact that can be determined by the jury at trial, but it's not one that you can determine as a that didn't account, and indeed Judge Connolly didn't look at that issue at all. The second and third false statements all relate to this set of forecasts which were the July projections, and I think it's important to note that under Reg 14a defendants had no obligation to discuss the July projections at all. There's nothing in the regs that said that they actually had to discuss historic projections. They never relied on those projections. They did not claim that the fairness was based on those projections. They only put that set of projections in in order to set forth this fabrication that the projections that ultimately were used were not somehow manipulated downward, and they did that in two ways by doing that. First is the that they were actually presented with forecasts for 2016, 2017, 2018, 2019, and 2020, and this is really important because in the third statement they make a statement that the forecasts that were used for the fairness projections were not quote materially different from the December projections, and then said the only difference was in the resulting in 2016 adjusted EBITDA figures of approximately 12% higher. So they're saying yes, we made some adjustments to talk about operations to 2016, but the rest of it is the same. When the falsity is that you actually had far longer projections, you have projections for 2018 through 2020 as well, and those numbers were dramatically higher. So by first omitting the fact that the longer projections were presented and basically hiding that fact that that would be a comparison that shareholders would want to make to determine whether those were manipulated downward, and the fact that you actually omit the fact that not only was 2016 material different, but if you look at the numbers the numbers show that 2016 was 12% higher, but they don't disclose the fact that 2017 was almost 17, 16.9% higher, that 2018 was 19% higher than the fairness projections, and that by the time you got to 2020, the projections, the fairness projections were 33% higher. This is material information, this was information that was hidden, and it was hidden by doing that double approach by both hiding that there were long-term projections in the first place, and actually failure to say what the difference was in 2017, 2018, 2019, and 2020. The third, the fourth statement I think that is important, is that the proxy statement talks about not only what, how the board came to its opinion that it was fair, but specifically said that they relied on the idea, and it's a double negative in the proxy statement, but it says that they did not include acquisitions that were not anticipated. Judge Kearney, who ruled on the motion to dismiss, specifically understood and said his interpretation, I think is the most fair interpretation of that language, he said, quote, Lionbridge incorporated anticipated transactions into the forecasts, which an investor may read to mean that Lionbridge incorporated into the forecast acquisitions it anticipated, making at the time it created the forecasts. Judge Kearney also said Lionbridge could only account for anticipated transactions and told shareholders that did so. The proxy statement did not disclose the projections included, that included the anticipated transactions, acquisitions. What we've learned... Mr. Barron, where does the proxy statement say that they accounted for anticipated transactions? The proxy says at PA 0172, the language is convoluted at best, and and the language go, and it's sort of a long, sort of a disclaimer, right, and it goes... It sounds like a roundabout way of saying it didn't, in answer to my question was, where, my question is, where in the proxy statement does it say that they are accounting for anticipated transactions, or they are including anticipated transactions? I think that's a fair question. I think what they, they use it, it's more of a double negative. They say it does, it doesn't include transactions that are not anticipated. So the language specifically says the forecasts reflect assumptions that are subject to change and are susceptible to multiple interpretations and periodic revisions based on actual results, revised prospects for our business, changes in general business or economic condition, or any other transaction or event that has occurred, or that may occur, that was not anticipated when the forecasts were prepared. So fundamentally they're saying that it does not include transactions that were not anticipated. Now I agree... Right, that doesn't mean, that doesn't mean as a matter of logic that, that the anticipated transactions, I mean it doesn't speak to the anticipated transactions, it just speaks to the not anticipated transactions, right? Well I think that an reasonable interpretation, and again this would be a question of for a jury to decide, now I don't think you make that determination as a matter of law, that transact, if you're saying I am not including transactions that are not anticipated, there is no basis for saying that if what you're, if you're saying well you know those that are anticipated aren't in there. And in fact all other transactions that are anticipated are included. And you know everything in a set of projections, like the idea that they will have future contracts that they believe they will have in there, the idea that... How could that be true when the second, the follow-up sentence says that any future acquisitions were not considered in making the management financial projections? That's, I'm taking that from Judge Connolly's opinion at page 9. And that is exactly the problem, right? Which is, it does, what it says is clearly future acquisitions, those that you don't know about. Anything you do not know about cannot be included, and that's exactly what Judge Kearney acknowledged, which is my account for anticipated transactions and told shareholders it could do so. If you're not anticipating it, if it's some transaction that we, that specifically there were three, there were three transactions that were quote unquote anticipated at closing within the next few months. That means just like they were expecting contracts to come in, just like they were expecting to pay payroll. All of these things couldn't happen, didn't happen yet. What Judge Connolly said is, well only the transactions couldn't be there if you didn't know about them. But the reality is, nothing you don't know about or nothing you don't anticipate is ever in projections. There are things in projections that you anticipate be it. That's how you create them by necessity, right? And so what, what at least the interpretation on a question of fact, and we raise in our brief that if indeed Judge Kearney interpreted that the proxy language to say that anticipated transactions including mergers were in there. If again we have evidence of our client, we have anticipated, we have evidence of analysts who all interpreted the same language in the proxy to say that anticipated acquisitions that we know there were at least three in the record were in there, then that is misleading. And in fact we that is materially misleading because that's 5% of the EBITDA in 2017. So again when you look at all four of those false and misleading statements, what we know is that there is a continued effort to undercut or to understate why the, what those projections were. Bringing those down over time in order to get to the the anticipated acquisitions. Yes. You know, let's assume that your interpretation of that part of the proxy is, is the interpretation we should adopt. What about, and then we get into a question of what anticipated means. The investment in Lionbridge stated that in his view the proxy would only include announced acquisitions, ones that are guaranteed to close. Something that hasn't been announced in my view, he said, would be at risk. My belief in reviewing this is that the projections would include specifically, specific acquisitions, would only include specific acquisitions if they were known and guaranteed. Another representative said the Institutional Shareholder Services stated that he also understood that the projections did not include acquisitions that have not been completed nor a series of smaller acquisitions. Including acquisitions would therefore not be something that typically happened. So is there any evidence of an alternative view of the term anticipated acquisitions other than what the representatives of your clients have set forth? Well, I, again, I think that Judge Kearney actually had the alternative understanding of it. I think that the question isn't whether this court can form its own belief as to what, even under a NOVA review, what that, what the term anticipated acquisition is, is whether or not a reasonable juror could, right? And whether a juror would say, would go along the lines of what Judge Kearney said or what Judge Connolly said. Yeah, I don't know. I'm talking about, I'm talking about your representatives who have made these statements. Yeah. And our, my interpretation of what our representative was talking about and was that anticipate the, the, you know, the anticipated transactions were specifically said, weren't in there. They interpreted it as those anticipated transactions were included. Now, it doesn't matter how you interpret what is an anticipated transaction. What we know is that by definition or by the own words of the corporation, there were three anticipated acquisitions. Each of one is a transaction. They are absolutely not in the set of projections. Defendants don't even challenge that question. So the assumption that they are included or they are not included is false in the proxy statement. At least that implication. They had the opportunity. They could have said, we have three transactions. Remember, they, they're not limited. They, they choose to put this information in regulation 14A doesn't mandate it. They could have said, we have three transactions that have been approved that we anticipate closing within a few months. Those transactions and the value associated with that is not included in the product or in the forecast. That was fully within the right. That would have been accurate disclosure had they done. So we don't have a claim here, right? This is because the claim is 14A and it is simply whether or not they omitted information or whether the statements were false. They could have done so. They did not. And what they said was false, or at least at a minimum that a jury can make that determination as to whether they are false. In the end, the defendants don't actually have argue that the statements overall that we say are evidence should have been. They agree with the interpretation of Judge Connolly, but they ignore the other interpretations of what the proxy said. And at the end, they have no real defenses to whether or not we should go forward at this stage on the evidence that was before the court. I think I've used all of my time or all of my time initially. Is there any questions I can answer for the court at this time? Judge Greenberg. No, nothing. Judge Circa. No. Okay. Thank you very much, Mr Barron. We'll hear you on rebuttal. Let's hear from Mr Ruben Rabinowitz. Thank you, Your Honor. And may it please the court. I want to focus my time on the legal arguments pertinent to this appeal, obviously. But but before turning to them, I want to at least offer a short response to the comments from my colleague, implying that the sale was somehow a raw deal for Lion Bridge's shareholders. Before the sale, Lion Bridge was performing poorly. Its stock price had risen had fallen by 18% in the three full years preceding its sale, compared to two indices of peer companies, which each rose during that period by 19% and 20%. Significantly, this is during the same period of time when plaintiff alleges that Lion Bridge was highly acquisitive, acquiring seven other companies. Your Honor's shareholders just weren't buying that acquisitions increased Lion Bridge's value. In the first three quarters of 2016, the three quarters immediately preceding the sale, Lion Bridge missed its its earnings expectations by huge amounts 87% in the first quarter, 41% in the second quarter, and 49% in the third quarter. The sale was then a culmination of a year long process that included a go shop period as well. No one offered a higher price than HIV is 575 per share. That price was greater than the price at which Lion Bridges stock was trading at the point on the public exchange. And it was a 24% premium over the average price in the preceding year. When the sale was announced, and in light of Lion Bridges repeated failures to meet its own projections, plaintiffs investment manager referred to it as a quote, yeah. Significantly, no one in plaintiffs entire organization read or even received the proxy statement issue in this case. Even so, before the shareholder vote, plaintiff instructed its investment manager to retain shares so that it could sue. Yet plaintiff did nothing to raise its concerns with Lion Bridge at the time. Rather, it voted on the sale, and voted in favor of the sale, and then it sued. On this appeal plaintiff challenges two isolated statements in the 97 page proxy statement, each of which led to a decision by the district court. And I want to be clear about this because my colleague has conflated them a little bit. First, there was a summary judgment for defendants on one alleged misstatement. And then earlier than that, there was a denial of a motion for leave to amend the complaint to add an additional alleged misstatement. So I'd like to address the two decisions by the district court in that order summary judgment first, and then the denial of the of the motion for leave to amend. At summary judgment, the sole reversing the order of what actually happened. Correct, Your Honor, to focus on what I think is the more important decision first, but but I'm happy to go in whatever order the court would prefer. Well, I just pointed that out. That's all. I mean, I don't care. Okay, so then Your Honor, let me tackle summary judgment and then move to the to the second. At summary judgment, the sole alleged misstatement remaining in the case was the proxy statements disclosure that the board had concluded that a fairness opinion from its financial advisor was one of many reasons supporting Lionbridge's sale. The parties don't dispute that the alleged misstatement is an opinion subject to the Supreme Court's Omnicare decision. There is no dispute on appeal that the directors sincerely believed that the fairness opinion was a reason supporting the sale. Rather, plaintiff argues now that the disclosure was misleading because the fairness opinion relied in part on projections of future performance that did not include potential future acquisitions. Our brief articulated four independent reasons to affirm summary judgment on this claim, and I'd just like to make two highlight points. So point one, the projections disclosed expressly. Sorry, the proxy statement disclosed expressly that the projections, quote, do not take into account any circumstances, transactions, or events occurring after the dates on which the forecasts were prepared. Any. That language, Your Honors, is dispositive of plaintiff's claim, because as the district court correctly held, it made clear to a reasonable investor that projections that were not in would that the projections did not include future acquisitions. Another judge has independently reached the same conclusion about nearly identical language, and that's the bound versus Harmon decision cited in our brief. As a result, because the proxy statement expressly disclosed that the projections did not include future acquisitions, the statement of the board's opinion regarding the fairness opinion could not have been misleading on the issue. Plaintiff's principal challenge. Let me let me just challenge you a little bit on that, Mr Benevides. Um, you just said that proxy statement said it did not include future acquisitions, right? That's right, Your Honor. Okay. And as I understand Mr Barron's argument, he's saying, Well, that that only goes so far because the document also said that we're not including transactions that are not anticipated. So if you're not including transactions that are not anticipated, that implies at least potentially implies that you were including transactions that were anticipated. Well, so, Your Honor, the sentence that my colleague has referred to is an exclusionary sentence, right? It's not as clear as you just summarized it and did it better justice than it does for itself. But but we're all agreeing that it is an exclusionary sentence. And Mr Barron's argument is that exclusionary sentence implies the inclusion of what is not excluded. But he's got a fundamental problem, which is, even if that sentence on its own might imply the inclusion of anticipated acquisitions, that sentence did not appear on its own. It's followed by the second sentence, the one that I'm referring to. And that sentence that Mr. Barron focuses on, which excludes does not include but excludes and maybe would imply if if it appeared on its own the inclusion, but it excludes and then it says in addition, the projections don't include any transactions. Given that grammatical construction, so exclusion sentence one that Mr. Barron likes, and then in addition, over and above whatever that sentence said, here's an additional exclusion, and that one has no qualifications. It does not include it. Why? Why would it? I wouldn't say that when we know, as a matter of fact, that the exact quote transaction closed just three days after after this sale. Well, your honor, it's not that simple. So the projections themselves were completed December 8th, 2012. So that's a full three months before the X projections. It wasn't like there was a three day interval. It was a three month interval. And the fact of the matter is, your honor, is that transactions until they close are always uncertain. And the facts of this case prove it. Mr. Barron says that there were three transactions anticipated at the time. That's his language, not any witnesses. But two of those three, it's undisputed, didn't ever close. And so those things are as the plaintiff's own representative testified, right? So he testified that he would not, reading the language in the proxy statement, he understood that to say that acquisitions would not be included unless they were announced, which none of Lionbridge's three were, or were guaranteed to close, which again, none of Lionbridge's acquisitions were. So the language... If we disagree with you on that, Mr. Barron mentioned that these transactions were material, or I guess he would say that Execo was material. Do you have an argument on materiality on that point, if we get there? The Execo transaction, your honor, was plainly not material. There's no dispute that it was a $7 million transaction and would not even have required an SEC filing to announce it, had Lionbridge still been a public company at the time. We have not made an argument as to materiality about all three of those transactions combined, but the court should not get to that question. There's no need to, because first of all, the language is clear, like Judge Connolly said. And then second of all, the next issue... Well, it's not so clear because the other judge on the case read it the same way. And again, your colleague on the other side says that that's sort of proof that reasonable minds can disagree, because we've got two federal judges reading that language differently. As I understand your rejoinder to that, you're saying that... You can't deny that two judges have disagreed on the language, that's a fact, but is it your argument that it's immaterial because this is not the type of thing that would be submitted to a jury, that this is a legal interpretation of the language of the proxy statement? That's right, your honor. So two responses. First is, this language is not subject to reasonable dispute. So our argument is, Judge Kearney just got it wrong, and that happens sometimes. With no disrespect to Judge Kearney, we believe he got it wrong. That's what Judge Connolly held also. And we think if you look at the grammatical construction of these two sentences, you'll reach the same result. More fundamentally, it simply is not true, it is inconsistent with precedent that where one judge holds that statutory language is... That language is ambiguous, another judge or appellate panel can't follow behind and disagree with that. If Mr. Barron's argument was correct, that that would apply in statutory construction cases and contract cases. If a district court judge held that language was ambiguous, an appellate panel or a succeeding district court judge presiding could not hold that the language was clear. That's been rejected over the course of time, multiple times, that is plainly not the law. So Judge Kearney looked at it, he thought at the pleading stage that potentially it was susceptible to multiple interpretations. We think he got it wrong because he didn't look at the two sentences together. What he did was simply look at the first sentence and didn't look at how they're constructed together. Exclusion sentence one, then in addition, no transactions are included in the projections. There is only one potential grammatical construction for that sentence. However, Your Honor, there is a second set of arguments still on the summary judgment claim that the court should look at if it gets past the language. And that is that plaintiff can't avoid that at its core, its claim is that the board's opinion endorsed the reliability of the projection. And although plaintiff's opening brief denies it, plaintiff's reply brief drops the pretense, as has Mr. Barron this morning. I'd refer the court to pages 17 and 18 of the reply brief specifically, and also to all the time Mr. Barron spent trying to compare the different sets of projections. This concretely shows that our arguments at parts 1b, 1c, and 1d of our brief are correct and dispositive on the summary judgment claim. Parts 1b and 1c focus on this court's decisions in Jaroslavitz and OFI asset management. Together, those decisions make clear in slightly different ways that where a proxy statement expressly discloses that a plaintiff can't claim that other language in the proxy statement was misleading because it implied the projections were reliable. Here, as we detailed in our brief, the proxy statement has pages of cautionary language about the projections, including that actual results will differ, maybe materially, and that no one from Lionbridge was indicating the projections were reliable. As an initial matter, this cautionary language means under Jaroslavitz that no reasonable investor could have been misled by the board's opinion because the proxy statement adequately explained the basis for that opinion, or the bases, that the board believed that the financial advisor's fairness opinion was a positive reason to support the sale, even though the fairness opinion used projections that the board would not stand behind and affirmatively disclaim. Second, the disclosures mean under OFI that plaintiff claim is foreclosed because the projections were not disclosed as a reliable estimate of future performance, but only as a historical artifact, what the financial advisor received. What's the purpose of a fairness opinion if the data submitted to the party giving the opinion here, Union Square, was so unreliable that the board wouldn't stand behind it? It sort of sounds like a garbage in, garbage out situation. Well, a shareholder might conclude that, Your Honor, and that would be fine. Shareholders probably have a multiplicity of views. They could conclude that, or they could conclude that the board uses this as one indicator among many. And frankly, even within the fairness opinion, there's 10 different analyses, some of which use the projections, some of which don't. I think what it is, is boards tend to like to look at a variety of different inputs, none of which are perfect, but all of which in the aggregate they consider. So here, the board had projections. Anybody can make up their mind what those projections were worth. As I've already told the court this morning, Lionbridge was particularly poor at projecting. It missed by huge amounts in the three quarters immediately before the sale agreement here. Nonetheless, they had projections, they shared them with the financial advisor, and the financial advisor said, based on these projections, here's what we would think. And then here's a bunch of other analyses as well. And the board can take that for what it's worth. The fact then that these were disclosed, along with the caution, I think is important. In fact, it tells the shareholders, look, here's the things we were looking at. You can make up your own mind as to how valuable you think they are. So that's what's going on, Judge Hardiman. And I think that's reflective of other companies as well. This is not anything unique. In fact, the plaintiff itself cited 46 different instances in only the three months surrounding this proxy statement where the same or similar language appeared in other companies' proxy statements. And that's on the docket in the district court at 32-1. Is that why the 10% haircut was taken? Because is that just, in your view, evidence of a safe approach, a conservative approach that, you know, we don't want somebody suing us because we are puffing the numbers here. We just... What's your position on that? Well, I want to be clear. There's no evidence in the record about what specifically motivated the... So the evidence is clear that the management of the company did reduce by 10% the number in November 2016. There is no evidence whatsoever as to what motivated that. The plaintiff didn't seek to add that claim until after the close of fact discovery, and they just didn't ask any of the witnesses about it, and none of the documents explain it. So my own sense is... Well, actually, my own sense is not relevant here. So there's no evidence of it, but that has nothing to do with acquisition. So when we're talking about the summary judgment claim, Your Honor, we're not talking about the 10% contingency reduction. That's on the separate alleged misstatement that's the subject of the motion for leave to amend the complaint. Does that make sense, Your Honor? I think so, but that sounds like it was... When you said there's no evidence in the record, that sounds like it was arbitrary, but I thought also there was something in the record that it was based on the updated 2016 fiscal year forecast. Well, that's... Yes, Your Honor, that's what... Pulling up the appendix at 171, where I think that's referenced. I apologize, Your Honor. Yeah, I meant witness testimony or internal documents. You're referencing the proxy statement, Your Honor, and the proxy statement did... So that's absolutely correct, and I shouldn't say that that's not meaningful. It is. So it was disclosed that in December of 2016, management of the company reduced the 2017 or adjusted the 2017 projections to account for the 2016 updated forecast. That's absolutely correct. Now, the question, turning to the motion for leave to amend, the question is, has the plaintiff alleged with particularity, this is an Exchange Act case, has the plaintiff alleged with particularity any facts suggesting that that contingency, that 10% contingency was not motivated by the company's poor performance, missing expectations by huge amounts in 2016, and was rather just arbitrary? There is no evidence put on that point. But the main argument I wanted to make on that point, at least this morning, is that the court doesn't even have to reach that issue, because the plaintiff's claim at its essence is simply one that challenges the projections themselves. And the proposed amended complaint admits it. At PA 363 and 364, paragraphs 136 and 137 of the amended complaint, it says boldly that the alleged misstatement caused shareholders to believe that the merger was more attractive than it truly was, and that had shareholders been informed of these alternative projections that Mr. Barron has spoke about already, they would have, quote, the company was worth materially more than the proxy statement indicated. That claim runs the plaintiff directly into this court's holding in OFI asset management, which held that where a proxy statement explains that projections are not disclosed as an estimate, as a reliable estimate of future performance, a plaintiff can't bring a claim that it was deceived into concluding the projections were reliable. So, if I understand you, what you're saying is, even if they prove what they allege, it wouldn't have caused them any work. That's right, Your Honor. The claim is foreclosed. The proxy statement itself was clear that the projections were not being disclosed as a reliable estimate. And the essence, the undeniable essence of the plaintiff's proposed claim is that it was deceived, and it thought that the projections were reliable. That requires... That would go directly contrary to the proxy statement, Your Honor. So, the amendment would have been futile, is what you're saying. That is correct, Your Honor, and that's what the district court held, Your Honor. Last point, Your Honors, is that the plaintiff's response is just a straw man. It's arguing that the defendants are suggesting that OFI, as we interpret it, would insulate all statements about projections. That is simply false. That is not the argument we're making, and that's not what OFI held. All that OFI held, which was not a new rule, but simply a well-established rule, is that words have meaning, and they're given those meanings when they appear in SEC filings. If a proxy statement indicates that projections are not disclosed as a reliable estimate of future performance, a plaintiff simply cannot mount a claim saying it concluded, or was deceived into concluding, that the projections were reliable. If there's no further questions, Your Honor. I don't have anything. Nor do I. All right. Thank you very much, Mr. Rabinovitz. We'll hear Mr. Barron on rebuttal. Thank you, Your Honors. So, if counsel's interpretation of OFI is accurate, then the board could, they could have actually created a set of projections for, I don't know, Apple, and put those in there and said, these are our projections. That could have been false, and therefore, OFI says, it doesn't matter. You can make a completely false statement, even as to the very nature of the projections themselves, and it doesn't matter because, according to Mr. Rabinovitz, then it, you know, shareholders are relying on it, and we tell shareholders they shouldn't rely on those because they're future expectations, so we can just lie. That's not what OFI did. In that three-judge panel, they didn't come up with this rule that any time you are relating to objections and the materiality of that, those projections, and we're talking the materiality, not the falsity, is because you as a shareholder are going to believe that that set of forecasts, which sets forth a value commensurate with what you are getting, is something you would rely on. It's not the same as saying you can just simply lie. And looking at OFI is a very strange case to rely on in that because in OFI, the primary issue was an open market securities fraud. The plaintiffs in OFI brought that case because they bought in stock in the open market after the merger, based upon what was said in the merger agreement, the proxy statement, and some analyst reports, and what they said was we bought because we saw what they said. We saw what the price was going to increase to in the sale, and we didn't know that you guys continued to do analysis and that your analysis would show that the deal was unlikely to go, what may not go through. When the deal did not go through, their stock price dropped. There was never an issue in OFI of shareholders who were holders of OFI, who were being asked to vote on the proxy, who were relying on information in the proxy to make that voting decision. That was nowhere in OFI. And in fact, when you read OFI, there are literally two sentences talking about the 14A claim. And those sentences, quite honestly, don't make any sense because there's no causation to a 14A claim because the plaintiffs in OFI were not actually shareholders who were voting on the, shareholders who were making that decision, or they weren't bringing a claim because they were making the decision that they wanted to sell their shares in the merger. They were saying we bought our stock at an artificially inflated price. So again, OFI is a very strange case for this overall proposition that anytime you're sort of tangentially related to projections that you can make false statements. And I think what is significant is that again, Mr. Rabinowitz, just like the district court on the basis that, you know, OFI was this all encompassing reason not to include, ignored the evidence that was before it as to false statements. And that was sort of the only way they could get away from the detailed false statements that we have. And again, defendants have absolutely no argument to the fact that, and you tried, you asked him, that the 10% haircut is not disclosed. What they disclosed is what the, what judge Hardiman, you read, which was that the, that those, the, they were updated for 2016 forecasts in 2017. They don't say anything about this cross the board haircut that makes them false and misleading in and of themselves. And Mr. Rabinowitz says nothing about whether they disclosed that. And in fact, they did not disclose that. And that in and of itself had a material impact on that value, on that value. Similarly, with regards to the July forecast, Mr. Rabinowitz has nothing to say about the fact that those July forecasts didn't need to be disclosed. And the only purpose of the disclosure of those July projections was so that they could say, Hey, they were only minorly different in 2016, but the reality is, the reason that they found it material, the reason that the defendant chose to put that information in front of shareholders is to be able to say, look, we did not manipulate these down, but putting in the true facts shows exactly that manipulation. And again, Mr. Rabinowitz has absolutely nothing to say about the fact that that was a partial statement that was misleading because it implies that there was only a 12% difference between July and December when in fact it was as high as 33% in the final year. And then we get, and then we get to the final set, the final projection, which is the issue of the acquisitions. And once again, it is not a, it is not reasonable to say this is decided as a matter of law. Materiality and TSTV Northway has always been a mixed question of fact and law. It is up to a jury to make the determination as to whether or not they think the statement implies one thing or another, what the fact that judge Kearney and judge Connolly interpreted it different is exactly the issue that the jury would decide, and they can decide that based upon all of the facts and, and, and, and I would, why, why would interpretation of the proxy statement be a question of fact for the jury? That seems like a, a constant question of law for the court in, in interpreting what the language of the proxy statement means, isn't that, isn't that? I don't, I don't see why, because, because it's, you know, this is, you know, the interpretation of what, whether or not it's being materially misleading, right. And that has two facts, right. What information... Before, before you get to the misleading, you have to determine what the it is, right. And that's what I'm suggesting is that the court, the court has to decide what the language says, and then perhaps it goes to the jury, to the jury to determine whether that language is misleading. And, and I would say that I have A, never seen that done before in Delaware or in any federal court decision in which the court says, this is what this statement means and telling a jury what a statement means, because that is exactly what the jury is supposed to decide. What does it mean? If you're, if you're right about that, wouldn't every proxy statement case have to go to a jury trial? No, because you wouldn't have, you wouldn't have information. And you, you still need information that either demonstrates that what was said was absolutely false or that there was under 14-A... Well, here, here, what was, what was absolutely false here? On, on... What's this, what's this, what's, what statement in the proxy, what representation the proxy statement was false? So on, so on, there were, there were again, right. First, it was false to say that the adjustment to 2016 was operationally related, right? When it was actually a 10% haircut. That's one. Two, to say that the, to say that the special committee was presented, presented with a forecast for only 2016 and 2017, when it was presented with forecasts for 2016 through 2020, it's false. And the third, to say it was material, it was materially false in 20, 27, sorry, in 2016 by 12% is, is materially false or misleading in that it was actually materially more off in 2017, 18, 19, and 20 by as much as 33%. And finally, with regard to the last one is the one that we spent a lot of time on, which is when they said it is not, or that, that when they say that it does not include non or transactions that were not anticipated, that double negative. Now I agree that there is a confusion between what it says later. And that seems like that is exactly what a jury has to determine, which way you're leading. If you tell, if you tell juror, for example, in one part of the proxy that none of your directors are conflicted. And in another part of the proxy, you say, well, this guy's conflicted. You're still saying something false in the proxy. You are, there is still something false. You cannot make this grammatic conclusion that they're there. And I have to say that the statement, and it is just an example of not including future acquisitions, is just clarifying that you're not including future things that you do not know will happen or not. That is exactly Judge Kearney's interpretation of that. And to say that Judge Kearney didn't interpret that is false. They're right next to each other. And he said, look, obviously you can't include things you don't know about, but all of projections are projecting things that you anticipate that may or may not happen. Nothing in a set of projections is guaranteed. Everything is at risk. Just contracts coming in, whether or not, whether or not you're going to be able to have synergies, whether or not you're going to be able to, whether or not you're going to have payroll, all of those things in the future are only anticipated. And the argument that Mr. Rabinowitz wants to make that, well, they didn't happen is actually goes the other way, because what happened is after the company got sold, they chose to abandon those two of the three anticipated in order to pursue one significantly larger acquisition. So, again, if you look at what happened and then ultimately the company did extremely well and has now announced that it's going to sell itself for some portion, some price or part of it for some price way over what it was purchased for. We don't look at those because the question is when you are projecting outward, you are always projecting outward for things you anticipate will occur. But you can't project for things that you don't know about. And that's all the proxy statement says. We don't know about all of the acquisitions. Yes, we have an acquisition program. Yes, we have been doing it historically. Yes, we are a roll up and that is part of our business. But we don't know which one we will do or not. But they did know three that they anticipated closing within months and one of them did. And those three alone are worth five percent. And that's material along with all the other issues. I can talk about this court's opinion. Well, we've given you a well past your time, Mr. Barron, let me just see if Judge Greenberg and I have any more questions. Nor do I. OK, do you want to make a concluding comment or two, Mr. Barron, since we have no further questions? I do. Before the court was a bulk of evidence, that bulk of evidence demonstrated for specific statements that were materially false and misleading. Any one of those four support a denial of summary judgment. We should be able to go to the jury to make the decision on all of them. But even one of them would allow us to go back to the jury to demonstrate that that falsity. There is no reason to ignore that. That was evidence that was both on notice to the court and to Mr. Rabinowitz and his clients to know what the materially false statements were that we learned through discovery information we couldn't learn otherwise. Thank you very much, Mr. Barron. Thank you, Mr. Rabinowitz. Thanks for the excellent briefing and argument. The court will take the matter under advisement.